**UNITED STATES DISTRICT COURT**

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARY E. DAVIS, | Case No. 1:15-cv-00722-SMS |
| Plaintiff, | |
| v. | ORDER AFFIRMING AGENCY'S DENIAL OF BENEFITS |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Gary E. Davis seeks review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits ("DI") under Title II and for supplemental security income ("SSI") under Title XVI of the Social Security Act (42 U.S.C. § 301 *et seq.*) ("the Act"). This matter is before the Court on the parties' cross-briefs, which were submitted without oral argument to the Magistrate Judge. Following a review of the record and applicable law, the Court affirms the decision of the Administrative Law Judge ("ALJ").

I. PROCEDURAL HISTORY AND FACTUAL BACKGROUND[1]

A. *Procedural History*

Plaintiff applied for DI and SSI on November 16, 2012 and November 30, 2012,

---

[1] The relevant facts herein are taken from the Administrative Record ("AR").

1

respectively, alleging disability beginning on January 1, 2010. AR 86-87, 213, 215. The Commissioner denied Plaintiff's claims on June 3, 2013, and upon reconsideration on October 23, 2013. 154, 157, 164, 170. Thereafter, he timely requested a hearing. AR 176.

Plaintiff appeared and testified before an ALJ, Robert Milton Erickson, on September 29, 2014. Also at the hearing were Plaintiff's counsel and an impartial vocational expert ("VE"). AR 37. In a written decision dated November 6, 2014, the ALJ found Plaintiff was not disabled under the Act. AR 30. On March 13, 2015, the Appeals Council denied review of the ALJ's decision, which thus became the Commissioner's final decision, and from which Plaintiff filed a timely complaint. AR 1, Doc. 1.

B.  *Factual Background*

In his December 13, 2012 disability report, Plaintiff stated the following medical conditions limited his ability to work: lower back pain, arthritis, post-traumatic stress disorder ("PTSD"), and depression. AR 231. Plaintiff also completed a pain questionnaire wherein he claimed unusual fatigue since 2008, which required him to take daily naps. He felt continuous pain at the joints and along the spine when he moved. While warm weather and medications alleviated the pain, the latter caused drowsiness, dizziness, and confusion. AR 238-239.

Plaintiff's Adult Function Report, dated March 27, 2013, states a typical day for him consisted of drinking coffee, reading the newspaper in the garden, and light weeding. He struggled to tie his shoes and needed support bathing. He prepared frozen dinners on a daily basis and did the laundry for one hour per week. When going outside, which he did daily, Plaintiff drove or used public transportation. He went to the laundromat and grocery shopping once a week. His social activities included talking with others two to three times per week. He enjoyed gardening, watching television and used to fish a lot. But since the conditions began, Plaintiff watched more television than before, could walk no more than 100 yards before needing to rest, could pay attention for only a

few minutes, did not finish what he started, did not handle stress very well, and feared being around people or large groups. He could handle changes in routine and follow written instructions well but considered oral instructions "easy to forget." AR 248-254.

Warren L. Haddock, a friend of Plaintiff's for twenty years, completed a Third Party Adult Function Report on April 6, 2013, which alleged Plaintiff suffered arthritic pain in the neck, back, and arms. Mr. Haddock stated Plaintiff typically sat around. He had no problems with personal care and prepared frozen dinners on a daily basis. He did laundry and light weeding, and occasionally goes out by walking, driving or using public transportation. He shopped for frozen food once a week, socialized with others two to three times a week, and had no problems getting along with others, but rarely did anything since the conditions began. He could walk for only a short distance, was good at following oral instructions, and fairly handled stress and changes in routine. AR 257-264.

In Plaintiff's second disability report, submitted on June 19, 2013, he reported a number of changes to his condition: worsening low back pain, arthritis, and PTSD symptoms. Plaintiff also alleged he developed carpal tunnel syndrome and very limited mobility in his daily activities. AR 268, 271-272. Finally, in his third disability report, dated November 22, 2013, Plaintiff alleged his physical symptoms had worsened. AR 276, 279.

Plaintiff had a continuous work history. He worked in construction from 1995 to 2000. He then worked as a roadside spray operator and, thereafter, supervisor beginning in 2004 until 2010. AR 240-243.

1. <u>Medical Evidence Before the Hearing</u>

Records show Plaintiff frequently visited the VA hospitals in Bakersfield and West Los Angeles ("VAWLA") between November 2011 and November 2014 for psychiatric care. Physicians and staff at the hospitals addressed various issues such as: tobacco use disorder, alcohol

3

abuse, PTSD, major depressive affective disorder, neck pain, chronic obstructive pulmonary disease ("COPD"), cardiovascular screening, nasal bone fracture, human immunodeficiency virus counseling, impacted cerumen, carpal tunnel syndrome, and iatrogenic ulnar neuropathy. Doctors generally prescribed medications, offered counseling on his conditions, and advised Plaintiff on maintaining a healthy lifestyle by exercising, improving diet, quitting smoking, and remaining sober. AR 308-314, 320, 326, 331, 340-341, 346, 348, 368, 407, 449, 454, 456-457, 459, 469.

On May 14, 2013, Dr. Oghenesume D. Umugbe of MDSI Physician Services conducted a comprehensive psychiatric evaluation of Plaintiff. Plaintiff stated he had mostly physical problems, chiefly arthritis and nerve damage in his right hand. He reported an injury which developed about twenty years ago after being knocked over at a K-mart store. About two years ago, he was diagnosed with PTSD stemming from his time in the navy where his ship nearly capsized. Plaintiff had never been admitted to a mental health hospital but obtained psychiatric treatment and received depression medication from the VA clinic in Bakersfield, CA. He denied any alcohol and drug abuse, and exhibited no problems in concentration, persistence, and pace. On examination, he appeared to lean to the right side and struggled with keeping his head still and with picking up a piece of paper from command. He had some deformity in his hands which may stem from possible arthritis. He showed intermittent eye gesture and walked with a tilt. AR 296-298.

Dr. Umugbe found Plaintiff demonstrated evidence of symptoms suggestive of PTSD from his time in the navy and depression related to the physical limitations he suffered. He opined that if Plaintiff's "physical/medical problems are adequately taken care of and he stops having pain and difficulties related to his medical problems, his prognosis for full recovery in his mental condition will be much improved." In sum, Dr. Umugbe concluded Plaintiff: (1) "has the ability to perform simple and repetitive tasks" based on his work around the house and yard, (2) "would be able to perform detailed and complex tasks if not physically limited," (3) "should be able to accept

4

instructions" based on his past work, (4) could perform activities on a consistent basis without special or additional instructions given his activities of daily living and work history, (5) could maintain regular attendance on the job, and (6) deal with the usual stresses of the workplace. AR 299-300.

Plaintiff also received a comprehensive internal medicine evaluation by Dr. Birgit Siekerkotte, another physician at MDSI. Plaintiff complained of low back and neck pain, osteoarthritis, PTSD, and depression. He was, at the time, taking medications for the low back and neck pain, and osteoarthritis. His back pain had begun radiating down the left leg and his neck pain had radiated to the arms. He had seen a chiropractor in the past for the low back pain. He rarely used a back support. During the physical examination, Plaintiff needed to hold onto something when standing on his toes, heels or one foot.

Dr. Siekerkotte's functional assessment of Plaintiff were: stand/walk for a maximum of five hours; sit for a maximum of six hours; lift/carry fifty pounds occasionally and twenty-five pounds frequently; occasionally balance and stoop; never climb; no limitations on kneeling, crouching, crawling, reaching, handling, fingering, and feeling; and some limitations in working at heights with heavy machinery. She opined that Plaintiff should wear his glasses at all times for driving and use a back support as needed. AR 301-305.

Also in May 2013, a state consultative examiner (CE) reviewed Plaintiff's record and opined that his mental impairments were not severe. The CE gave great weight to Dr. Siekerkotte's opinion concerning Plaintiff's limitations, finding it "consistent with the totality of the evidence[.]" AR 95-96. Another CE opined, in October 2013, after Plaintiff sought consideration of Commissioner's denial of his claims: "There is no historical evidence that would lend support to his allegation of worsening his mental condition, his PTSD especially. The assessment of severity at the initial level is supported by the evidence and is still pertinent." AR 126.

2. Plaintiff's Testimony Before the ALJ

Plaintiff was, at the time of the hearing, living rent-free with a friend. AR 40. In exchange for living there, he did an hour of yard and garden work per week. AR 47. He had a driver's license and would drive to get groceries. AR 42, 48. He had arthritis in the elbows, which flares up a couple of times a year and lasts between four to five weeks. AR 49. He had only fifty-percent use of his right hand which he broke about eighteen years ago. AR 50. He also suffered a back injury about twenty years ago and in the last six years began experiencing severe neck problems. AR 52.

Plaintiff briefly discussed his work history and explained the requirements of his past job as a spray operator and, later, supervisor. AR 53-58. He stopped working because the constant driving was too much to bear given his neck and back problems. AR 75. He also discussed his interest in fishing, an activity which he enjoyed but could no longer do because he could not afford it. AR 46, 60-61. When questioned by his attorney, Plaintiff stated what prevented him from fishing every day was "[h]alf and half, income and my body." At times, Plaintiff wakes up with a pain level of about a ten until he takes his medication, which caused blurred vision and dizziness. AR 74.

Concerning personal hygiene, Plaintiff shaved only once a week because of the shaking in his hands. He could stand and sit for no longer than thirty minutes before needing to adjust due to his back pain. He could walk for about five minutes or about a block. AR 62-63.

Plaintiff suffered panic attacks two to three times per week. AR 64. He did not like being around large crowds because they could trigger a panic attack. AR 68. But he has taken the bus, which can get crowded at times, from Bakersfield to the VA hospital in Los Angeles. AR 70.

3. Vocational Expert Testimony before the ALJ

Robert Raschke, the VE, characterized Plaintiff's past jobs as a hydro spray operator (SVP[2]

---

[2] "'SVP' refers to the 'specific vocational preparation' level which is defined in the [Dictionary of Occupational Titles] as 'the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a

6

4) and a pest control inspector (SVP 7).  AR 76.

The ALJ asked the VE to consider a person who could lift or carry fifty pounds occasionally and twenty-five frequently, occasionally balance or stoop but never climb, stand or walk five hours and sit up to eight hours of an eight-hour workday.  Additionally, such person should avoid concentrated exposure to unguarded heights and heavy machinery.  When asked if such person could perform Plaintiff's jobs, since 1999, at substantial gainful activity levels, the VE opined that such person could perform the pest control inspector job.  AR 76-77.

The ALJ then asked the VE to consider a person who could lift or carry ten pounds occasionally and one to nine pounds frequently, stand or walk for two hours and sit for six hours of an eight-hour workday, occasionally balance or stoop but never climb, who had occasional gross manipulation with the upper extremities, and who should avoid concentrated exposure to unguarded heights and heavy machinery.  Notably, such person and could stand, walk and sit for only five minutes continuously.  The VE opined that such person could not perform either of Plaintiff's past jobs.  If such person is age fifty to fifty, has passed the GED test, and has the same past work experience as Plaintiff, he would not have any readily transferable skills given the limitations.  AR 78-80.

4.  <u>Medical Evidence Provided After the Hearing</u>

The record contains medical evidence dated after the hearing before the ALJ.  These include October 2014 progress notes from VAWLA showing Plaintiff was assessed with myofascial pain, spinal spondylosis and stenosis, and likely cervical radiculopathy.  Physicians placed Plaintiff on a medication regimen and recommended other treatment options.  AR 488, 490, 492.  In November 2014, Plaintiff was to undergo sensory and motor nerve study of the lower extremities and EMG of

---

specific job-worker situation.' *Dictionary of Occupational Titles,* Appendix C, page 1009 (4th ed.1991)." *Bray v. Comm'r of Soc. Sec. Admin.* 554 F.3d 1219, 1230 (9th Cir. 2009).

the upper extremities to rule out cervical radiculopathy. It was recommended that Plaintiff follow up with his orthopedic surgery service to see if he should have surgery on his left hand. AR 496.

5. <u>ALJ's Decision</u>

A claimant is disabled under Titles II and XVI if he is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment that can be expected to result in death or has lasted or can be expected to last for a continuous period of no less than twelve months. 20 C.F.R. §§ 404.1505(a), 416.905(a) (2012). To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process which an ALJ must employ to evaluate an alleged disability.[3]

In his written decision, the ALJ found that at step one, Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of January 1, 2010. At step two, Plaintiff had the following severe impairments: osteoarthritis and degenerative disc disease. At step three, Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. Plaintiff had the residual functional capacity ("RFC") to perform medium work as defined in 20 C.F.R. sections 404.1567(c) and 416.967(c), but with the following limitations: stand or walk five hours and sit for six hours out of an eight-hour workday, occasionally balance or stoop but cannot climb, and must avoid concentrated exposure to unguarded heights and heavy machinery. At step four, Plaintiff could perform his past work as a pest control inspector. Consequently, the ALJ concluded Plaintiff was not disabled as defined under the Act. AR 24-30.

---

[3] "In brief, the ALJ considers whether a claimant is disabled by determining: (1) whether the claimant is doing substantial gainful activity; (2) whether the claimant has a severe medically determinable physical or mental impairment or combination of impairments that has lasted for more than 12 months; (3) whether the impairment meets or equals one of the listings in the regulations; (4) whether, given the claimant's residual functional capacity, the claimant can still do his or her past relevant work; and (5) whether the claimant can make an adjustment to other work. The claimant bears the burden of proof at steps one through four." *Molina v. Astrue*, 674 F.3d 1104, 1110 (9th Cir. 2012).

## II.  DISCUSSION

A. *Legal Standards*

This Court reviews the Commissioner's final decision to determine if the findings are supported by substantial evidence.  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*, 402 U.S. 389, 401 (1971)), but "less than a preponderance." *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401. "If the evidence can reasonably support either affirming or reversing a decision, we may not substitute our judgment for that of the Commissioner.  However, we must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (internal citation and quotations omitted).  "If the evidence can support either outcome, the Commissioner's decision must be upheld." *Benton v. Barnhart*, 331 F.3d 1030, 1035 (9th Cir. 2003); *see* 42 U.S.C. §§ 405(g), 1383(c) (2012).  But even if supported by substantial evidence, a decision may be set aside for legal error. *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009).

Moreover, an ALJ's error is harmless "when it was clear from the record that [the] error was inconsequential to the ultimate nondisability determination." *Robbins v. Soc. Sec. Admin*. 466 F.3d 880, 885 (9th Cir. 2006).

B. *Analysis*

Plaintiff's contention on appeal concerns the ALJ's treatment of Dr. Umugbe's psychiatric evaluation.  Doc. 14, pp. 6-10.  Accepting that the ALJ gave great weight to Dr. Umugbe's opinion, Plaintiff avers: (1) the ALJ incorrectly summarized the opinion which resulted in a "functional calculus . . . under inclusive" of Plaintiff's physical limitations and (2) the opinion precluded

9

Plaintiff from performing his past relevant work. Doc. 14, pp. 8- 10. (italics in original). The Commissioner argues Plaintiff's position is meritless because the ALJ properly credited Dr. Umugbe's opinion such that any error was harmless. Further, she asserts that in making the RFC determination, an ALJ does not rely solely on one medical opinion but must also look to other evidence, which the ALJ did in this case. Doc. 15, pp. 6-10.

The Court turns first to the averment that Dr. Umugbe's opinion precludes Plaintiff from performing his past relevant work. As stated, the ALJ found Plaintiff could work as a pest control inspector, a job which he performed in the past. Plaintiff objects to the finding, alleging that the level four reasoning required of the job exceeds his capacity in light of the limitations found by Dr. Umugbe. As an initial matter, Plaintiff presents an argument scant of specificity and analysis. *See Hibbs v. Dep't of Human Res.*, 273 F.3d 844, 872 (9th Cir. 2001) *aff'd sub nom. Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721 (2003) ("We therefore cannot grant relief [on this] argument, because he has failed to develop the record and his argument sufficiently to render it capable of assessment by this court."). Plaintiff does not explain how Dr. Umugbe's findings equate to an incapacity to engage in the kind of reasoning required as a pest control inspector—the capacity to "[a]pply principles of rational systems to solve practical problems and deal with a variety of concrete variables in situations where only limited standardization exists" or "[i]nterpret a variety of instructions furnished in written, oral, diagrammatic, or schedule form." DICOT §§ 168.267-098. Quoting the above language from the Dictionary of Occupational Titles and stating that "[t]he limitations given by Dr. Umugbe, which the ALJ fully credited would preclude Mr. Davies' [*sic*] past relevant work" are insufficient. Plaintiff has not shown how Dr. Umugbe's opinion undermines the ALJ's finding at step four.

Moreover, the finding that a claimant can perform past relevant work turns on the RFC determination, which as the Commissioner correctly points out, involves consideration of the record

10

as a whole and not just the opinion of one physician.   In addition to Dr. Umugbe's evaluation, the ALJ considered Dr. Siekerkotte's evaluation, the state consultative examiner's findings, Plaintiff's first and second disability reports, pain questionnaire, Adult Function Report, medical records from VAWLA and the VA hospitals in Bakersfield, and Mr. Haddock's Third Party Adult Function Report. AR 24-26, 28-29.  From these, the ALJ concluded Plaintiff could perform medium work with some exceptions.  And with that, along with the VE's testimony, the ALJ concluded Plaintiff could perform his past job as a pest control inspector.  Dr. Umugbe's opinion was therefore not the only evidence used to determine whether Plaintiff could perform his past relevant work. Consequently, even assuming Dr. Umugbe's opinion, made after only one examination, undermined Plaintiff's capacity to work as a pest control inspector, he has not shown that all of the other evidence in the record undermined the ALJ's findings.

   Finally, Plaintiff's averment that the ALJ incorrectly summarized Dr. Umugbe's opinion also fails. At step two of the five-step sequential process, the ALJ recounted Dr. Umugbe's evaluation in detail, noting some of the general observations, conclusions from the mental status examination, diagnoses, and the functional assessments.  The ALJ then stated, "[Dr. Umugbe] opined that [Plaintiff] could perform simple and *complex tasks*, accept instructions, perform activities on a consistent basis, deal with the usual stress encountered in the workplace, and maintain regular attendance[.]"  AR 26 (emphasis added).  Contrasting this with Dr. Umugbe's actual written evaluation, one can see that the ALJ did not recount Dr. Umugbe's evaluation report verbatim.  The ALJ did not state, as Dr. Umugbe did, that Plaintiff "would be able to perform detailed and *complex tasks if not physically limited*."  AR 299.  But the ALJ's omission of the words "if not physically limited" does not, without more, make the RFC determination under-inclusive.  Unlike Dr. Siekerkotte who provided a functional assessment of Plaintiff's physical capabilities, Dr. Umugbe provided a functional assessment of Plaintiff's psychiatric limitations.  In fact, Dr. Umugbe stated,

11

"[i]t is my view that if his physical/medical problems are adequately taken care of and he stops having pain and difficulties related to his medical problems, his prognosis of full recovery in his mental condition will be much improved." AR 299. This directly contradicts Plaintiff's assertion that "Dr. Umugbe offered his medical opinion that [Plaintiff's] physical limitations would impact his mental functioning . . . ." Doc. 14, p. 9. Dr. Umugbe made no such opinion. Plaintiff has not, in this case, shown how he was prejudiced by the ALJ's omission. *See e.g.*, *Schultz v. Colvin*, 32 F. Supp. 3d 1047, 1056 (N.D. Cal. 2014) ("Plaintiff bears the burden of demonstrating how the ALJ's error prejudiced her.") (citing *McLeod v. Astrue,* 640 F.3d 881, 886–88 (9th Cir.2011). And as discussed, the ALJ relies not only on Dr. Umugbe's opinion in making the RFC determination.

### III.  CONCLUSION

Accordingly, the Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of Court is DIRECTED to enter judgment in favor of the Commissioner and against Plaintiff.

IT IS SO ORDERED.

Dated:   **May 25, 2016**          /s/ Sandra M. Snyder
                                   UNITED STATES MAGISTRATE JUDGE